Next case is Ryan Perry v. Cable News Network. Mr. Lawson is here for the appellate. Mr. Zwillinger is here for the appellee. Good morning. Mr. Lawson, you may begin when you're ready. Good morning, Your Honors. Aaron Lawson on behalf of Ryan Perry. The parties, as you know, have put into dispute three issues in this appeal, and I understand that ordinarily the jurisdictional issue, whether Mr. Perry has standing, would take precedence. But given the Third Circuit's conclusion that the disclosure of information in alleged violation of the VPPA is a clear de facto injury, I'd like to move directly to the second issue, whether Mr. Perry is a subscriber under the VPPA. And the inquiry here, of course, begins with this Court's decision in Ellis and the First Circuit's decision in Yershov. And as I read those two decisions, I think they're actually not that far apart. Both are looking for some indicia of commitment, right? And Yershov thought that arranging for access through a proprietary mobile smartphone application by itself was enough of a commitment to qualify the downloader as a subscriber. This Court in Ellis said, no, I don't think that's right, right? We want something else beyond that. Perhaps in this context, that arranging for access is insufficient. So we want something more, some other indicia of commitment. And we think we've got that here. What we propose to allege is essentially one relationship layered on top of the Ellis-Yershov relationship, right? So our basic premise is that a cable subscription entitles the subscriber to more than just the one-way transmission of programming from the channel through the provider to the user. But you're paying the cable provider and not CNN directly though. Right. So it seems rather remote to me. So I think as we've discussed in our papers and as CNN's website acknowledges, right, we often talk about subscribing to particular channels. And I think that's because even though your relationship is most immediately with the provider, you still have a range for access to each of these channels, right? You're arranging through the provider, but you are arranging for access. And you mentioned the cable bill. And I think it's worth noting that your cable bill is essentially, at least in part, a series of pass-through charges, right? I mean, the cable bill is built on the fees that the channels themselves. So I get 100 stations on cable. One of them is ESPN. I'm a subscriber to ESPN. I have an ongoing relationship or commitment to CNN, even though I don't pay, or to ESPN, even though I don't pay them any money. Well, if you also download ESPN's proprietary application, I think that you do at that point, right, for a couple of reasons. First, right, you have to, I think it's as true on ESPN as it is with the CNN app, as we discussed, that you're still going to have to log in to access content that someone who's merely downloaded the app can't access. So there's that. And the Ellis Court, of course, told us that that was material. And I would also point out that oftentimes what the content that's available on these applications is going to either replicate or augment the content you would otherwise get through the channel. And why download the application if you're not somehow a committed consumer, right? So I take your point, right, that oftentimes your cable package is quite vast, especially these days. But I think it is still the case that you've arranged for access to all of these channels. And so oftentimes, especially in the case of ESPN or CNN, right, you are given access to a host of content on a variety of platforms. And when you choose to access this content on one of these other platforms that corresponds to one of the channels you've already arranged for access to, we think that relationship is governed by the VPPA. And that's why this case is different from Ellis. Counsel, let's just go start one. You agree we're bound by Ellis. Sure. And so the way I view Ellis, they're talking about it's too transitory a relationship to be a subscriber. Just that's my shorthand, Ellis. And so what you're saying is by having to pay the cable company, it's no longer a transitory relationship. Is that where you are? Yes. So as one of the things we point out in our papers, and I think CNN pointed this out below as well, right, when you simply download the application, there is empirical evidence that many applications are downloaded and deleted the same day or after a couple of uses. And I think this supports sort of the Ellis Court's conclusion that you can't really infer anything from the simple act of downloading. And our contention is that this is a different situation where you can sort of infer something, right? And we're just, I think, I'd also like to point out that I think Ellis is just looking for indicia of commitment, right, the registration that Ellis talks about. One could undergo a formal registration and then after a day cancel that registration. But I don't think Ellis would say that there were no indicia of commitment there that would make someone a subscriber. So we're just looking for sort of some background context that might tell us something about the decision to download the app. Looking at Ellis, which we're bound by, why aren't most of the Ellis factors, why aren't they unchanged? The additional allegation doesn't commit him to CNN. It doesn't give him delivery that didn't already exist through the app. It doesn't express association or pay CNN. Wouldn't that be the argument that this falls in Ellis? That is one argument. That is the obvious, I think, counterargument to our position. And he can delete the app anytime he wants to. Sure, sure. But in the same way, someone could cancel their registration anytime they want to. This is why I believe that what Ellis was looking for was some background fact that might give context to the decision to download the app that might suggest that it isn't just the transitory commitment, right? But I'd also point out, given the sort of differing conclusions in Ellis and Yershov, I think that those courts both recognize the question is somewhat close, right? Ellis wasn't a slam dunk. If it was, I think the First Circuit probably would have come out on the same side. So there's already something there, and we think there's enough more background here, something that wasn't there in Ellis, to dictate a different result. So I'd like to move now to the question of personally identifiable information, which this court didn't reach in Ellis. And our basic contention here is that in all privacy contexts, be it statutory or common law, a court is able, sometimes obliged, to look at the context in which a disclosure has been made. And so as we see it, the question is, is there some reason in the text of the VPPA to depart from that tradition here? Indeed, we'd need to require the court to look at this disclosure in isolation, because as we allege in paragraph 26 of the amended complaint, this is information that Van Gogh, the recipient, uses to automatically identify the subjects of the disclosure. So is there some reason to ignore that? And we think no, because personally identifiable information— What do you mean by personally identify the subscriber, if they're a subscriber? They can find out—can they find out the name of the consumer? Sure. So as we understand it, based on what Van Gogh made available on the Internet three years ago, right, they have—they use this type of information to correlate the MAC address, which has been disclosed, to things like demographic information, payment information, which probably gives you name, right? A name is generally associated with a credit card. That's why you have to give the name when you're purchasing something. They can find out my name and my email address? I think that's very likely, yes. Because the issue is whether or not the average person can identify it, and not Van Gogh, right? Well, I would disagree with that. I agree that's what the Third Circuit said in Nickelodeon, but this gets back to my point about context, right? I don't think that the term personally identifiable information, as it's used in the VPPA, dictates sort of an ordinary recipient test, essentially, right? So the VPPA does give a definition of the term personally identifiable information, but the innovation is that it attaches it to the record of the video viewing, right? That's not something that would be consistent in other statutes. But I don't think that that itself limits the— So what they're really interested in are my viewing habits, right? Among other things. Among other things. But Van Gogh can find out who I am. Yes, that's what we believe is happening, right? As the amicus, as Epic puts it. But we wouldn't know that until we get past the pleadings, right? Right, right. Exactly. And so historically, as this Court noted in its Speaker decision about 13 years ago, this is a question of identification that's traditionally been for the jury, right? We allege that this is something that Van Gogh is able to do, right? This is about half their business model is using this information to compile lots of information on consumers. So as the amicus, Epic, points out, right, they estimate there are probably 425 people named Ryan Perry. And using the disclosure from CNN, Van Gogh is able to tell you which of those 425 Ryan Perry's we're talking about, right? That is our basic contention. And we don't think that Congress's decision to use a term of art in the VPPA lends itself to this sort of unique test in this context that wouldn't exist in any of the other places that you find the term personally identifiable information or something similar in the United States Code. So because Van Gogh has all of this background understanding that allows them to understand the disclosure of the MAC address in a particular way, when it is disclosed to Van Gogh, that is an actionable disclosure, right? So if it were disclosed perhaps to someone who CNN could not understand it, we might be in a different place. So Van Gogh, I mean, so Van Gogh finds out which device it is and then that connects it to all the other data it has. Right. Yes. That is our understanding based on what they placed on the Internet 3 years ago of what they're doing with this information. And because of that, right, CNN is giving it to Van Gogh, in part because they know this is what Van Gogh can do with the information. And so in these circumstances, we believe that this information qualifies as personally identifiable information. If the Court has no further questions, I'll reserve the balance of my time. Thank you, Mr. Lawson. We'll hear from Mr. Zwillinger. Good morning. May it please the Court, Mark Zwillinger on behalf of CNN. Judge Black, as you recognize, we start with the backdrop of this Court's binding decision in Ellis. And Mr. Perry has conceded in the briefs that based on the holding in Ellis, the district court was right to conclude that his use of the CNN app did not make him a subscriber under the VPPA. Without more. Without more. That's the word the judge, Jordan, used in the opinion. But the more that he wants to add is an allegation that he can watch television, he can watch CNN on television at home because he's subscribed to cable TV. Well, he does, doesn't he? He does. I take it at face value he subscribes to cable TV and he can watch CNN, but that's irrelevant to the VPPA for two reasons. The first is the relationship he's created is a relationship with the cable provider, not a relationship with CNN. His argument would make you a subscriber to the Animal Planet and the Oxygen channel. Judge Black, you'd be a subscriber to Fox News and MSNBC at the same time. He's just watching television. And the second reason is the legislative history tells us that the relevant relationship has to be with a portion of the services covered by the VPPA. And cable television is not covered by the VPPA. Watching television is not covered by the VPPA. The Cable Act, the Satellite Act, they cover watching television. Television is outside the scope of the statute. So when a person signs up for a relationship with Comcast, for example, it's Comcast who chooses what television stations are in the bundle. Mr. Perry doesn't allege that he picked CNN on a stand-alone basis to have as part of his cable subscription. He alleges that Comcast just provided it, and that cable provider could just drop it at any time, and that would change his subscription relationship with CNN. That can't be the without more that we're talking about in Ellis. Otherwise, as I said, all of us would be subscribers to all 500 channels that our cable television offers. There was a set of rules governing what Comcast can do, and those are in flux? The statute's not in flux. The Cable Act has been around for a long time. The rules as to what an ISP can do are in flux, but not in terms of what they can do as the television provider. So your argument is that is a whole separate category of controls on distribution of information that is not involved here? That's correct. 47 U.S.C. 551, the Cable Act provides a set of rules for the disclosure of information about cable subscribers are not at issue here. We have to focus on what the word subscription means in the VPPA. And in 1988, we had a very clear understanding of what the statute was passed for. Judge Bork's video records were disclosed and published in the newspaper. The relationship that he's describing, a relationship where you can watch something on your television, is so unlike that. But the act doesn't use the word subscription or subscriber. It uses the word consumer, though, right? It does, and it describes the consumer in three ways, someone who purchases material, rents material, or subscribes to videotapes or other audiovisual material. The act uses very broad language. Congress could have used the word subscriber, and then it would be an easier case for us to decide. But it used broad language. It used the term consumer rather than subscriber. I would offer that they actually used much more restrictive language. In the same statute, 18 U.S.C. 2701 to 2709, all the provisions before, Congress used the word user. Congress knows how to use the word user. They know how to use broad language. They were after something specific, not general, which is someone who has a relationship where they purchase things, rent things, or subscribe to things. But in an effort to protect privacy of people who use these outlets, it used the word consumer for the purpose of this particular provision of the statute and not subscriber. I agree with you, but it defines consumer in three ways. Subscriber is one of those ways. I don't think consumer is a broader term. I think it's a narrower term. A consumer is someone who has an ongoing relationship with a company, not a casual viewer. I mean, you're talking here about watching TV. You go through an airport, CNN is on. You might be interested in watching CNN. You're a casual consumer of content. This is what we're talking about. He flips the channel, CNN is on. He has no relationship with CNN, and the best illustration of that is CNN does no idea who he is. We don't have to get rid of common sense in interpreting these statutes. Where in the world do we have a subscriber relationship, especially in 1988 when Congress passed the VPPA, where the company providing the subscription has no idea who their subscribers are? That's my argument. Watching television cannot make you a subscriber. CNN would have no idea who its subscribers are. And if you have any doubt about this part of the argument, I would say go to the legislative history on page 12 of the Senate report where the Senate was talking about what makes you a consumer, what conduct is covered by the VPPA, and it says if you're a department store and you sell videotapes in one department and you sell towels in China in another department, the relationship of buying the China and the towels doesn't make you covered by the statute, only the videotape service provider relationship. So he has to be a subscriber, a purchaser, to the app that delivers the video materials, not to television. Again, television is outside the scope of the VPPA. The other thing I wanted to mention about this particular argument is in the Ellis case, which involves the same counsel, Mr. Andrews, made the same argument on behalf of Mr. Ellis when he asked for a petition for rehearing on Bonk, that they should be allowed to add the allegation that he was a subscriber to Cartoon Network because he watched it on cable television, and that was not enough to persuade the court to rehear it on Bonk. So I'd like to turn to the PII question, unless, Judge Rustani, you have a question about subscriber. I'm just thinking. I'll let you know. Okay, fair enough. Fair enough. The other reason the judge denies the motion for leave to amend is that nothing would change the allegation about the nature of the information that was disclosed. And the nature of the information disclosed here is simply the MAC address of a device. And Judge Ross followed the majority of courts that have held that that device ID is not personally identifiable information under the statute. So again, the amendment would be futile. And that's the correct result. And I think it's consistent with what the Third Circuit said in Wray-Nickelodeon. If you remember the Nickelodeon case. We can't really make that determination unless we get to discovery, though, right? No, I think, as we heard already this morning, discovery follows the pleading of a well-pleaded complaint. And we don't have a well-pleaded complaint on these particular facts as to what constitutes PII. We're trying to find something that identifies a person. And there's no question that a MAC ID identifies a device. In the Nickelodeon case, there were 11 pieces. I know can find out who I am when I download this app, right? If I'm a CNN, if I watch CNN through my cable provider. I do not think that is a well-pleaded allegation at all. The only place that appears. Assume it's a well-pleaded allegation. Well, if I could for one minute. Paragraph 26 of their complaint is the only place where they say that Bango automatically identifies all viewers of the CNN app. That would cannot be a plausible allegation unless Bango knows every single person in the world. They don't plead that Mr. Perry ever did business with Bango. They don't plead that Bango had his information. They just say that Bango can automatically identify everybody. What's the purpose of Bango if it's not to add to make a link between this device and somebody you want to sell something to? That is a great question, Your Honor. And the answer is to count unique views. And that's it. And it's very easy to put yourself in the position of. Why are you counting unique views? To determine if one video is being seen by 100 people or being seen by one person 100 times. That's the purpose of it. You put up content on the Internet. And we all put up content onto the Internet. In fact, almost all courts I've appeared before recently have put up the video of their oral arguments on the Internet. And they want to know if people are watching them. And so they see that it has been watched 100 times. Is that me and my wife watching me argue 100 times and showing all of our family? Or are 100 different people interested in that argument? If you put up video on your site and you want to know how many people are watching it, you hire an analytics provider to tell you that. And the way they tell you that is they look for something, anything that's unique about a particular visitor. They might look for their device ID. They might look for their IP address. They might look for their browser fingerprint. Whatever it is so that they know that the viewer who saw a video at 1 p.m. today is different from the viewer who saw that video at 2 p.m. That's why they do it. So what's the purpose of this statute now? The purpose of this statute is to protect my private video viewing habits, right? It is. And so they haven't alleged that by providing this information to Bango, the allegations of this complaint are insufficient to identify me and find out what I'm looking at on my smartphone? Yes, that's our standing point. The third argument that Mr. Lawson gets to is that we don't think they're standing under Article 3 because he has not properly alleged. So I have to actually pay CNN some money directly for use of my app on my smartphone in order for me to have the benefits of the protection of the act? You have to have some relationship with them. I don't think you have to pay them money. You could give them your name and sign up for a newsletter or sign up for the video newsletter. You have to provide them with the hallmarks of a subscriber relationship. Yeah, and they're saying, well, we don't have to do that. We'll find out who you are because we send this information over to Bango. That's actually not what CNN is saying. CNN is, as I said, trying to count unique views. But remember… Well, they can find out who I am anyway. I'm sorry, who? CNN can. Bango can find out who I am through CNN, right? That's what they're alleging in their complaint. As I said, I don't think they've alleged it very well. It's also not true. The whole purpose of the analytics provider is to do something completely different than identification. And that's really the lesson of the Yershov case. And I don't know if this Court is aware of this. But after losing the issue in the First Circuit, nine months of discovery ensued. And two weeks ago, the plaintiffs dismissed the Yershov case because they couldn't find one shred of evidence that Mr. Yershov was ever identified by Gannett or by Adobe. I argued the Yershov case. The same lawyers are involved. The complaint contains these broad allegations that these analytics providers can identify anyone without actual concrete injury in fact that the plaintiff has been identified. Let me turn to one other point, and you raised it, Judge Wilson, which is what is the purpose of the statute? That's a great question because this is not an online tracking statute. There's a separate statute, the Children's Online Privacy Protection Act, which was designed to be an online tracking statute. It's to prevent people from being contacted online. This is an identification statute. This statute is about whether somebody by name or otherwise a real-world person is being identified by their video viewing habits. It's not whether you're being served ads. It's not about behavioral tracking or should your video viewing influence what you see online. It's about identification. And when Congress wants to pass a statute that's broader, that evolves over time, that's about other things, that knows how to do it, the Children's Online Privacy Protection Act allows the FTC to pass regulations to determine what is personally identifiable information over time. And the FTC has done that and expanded the categories of personally identifiable information. What the VPPA is is a statute that was passed for a specific purpose. Judge Bork's video records were disclosed. It was published in the newspaper. He was identified, and Congress did something about it. But it wasn't the overall Internet privacy statute that the plaintiffs wanted to be. And since then, Congress has been very active in privacy law. It's passed HIPAA. It's passed Gramm-Leach-Bliley. It amended the VPPA in 2012, and it knows how to do broader privacy legislation, and it didn't do it here. The amicus in this case, the Electronic Privacy Information Center, specifically went to Congress in 2012 and said you must expand the VPPA to cover things like device identifiers. Congress amended the statute and didn't do that. And this circuit has always said when Congress knows how to say something and doesn't say it, its silence is controlling. And I would say to the court, do not make the VPPA that was passed in 1988 to stop Judge Bork's video records something that it's not. If Congress wants to take up a grand Internet piece of privacy legislation, it can do that, but it didn't do that here. Well, if we restrict personally identifiable information in the way you want, then Congress can pass another law using those words and we'll be stuck with this information when we know that there is massive data being collected that can be tied to a particular device. So I'm not sure that we want to get into the business of limiting PII in the way you said. It's going to have repercussions beyond the old act. Well, the key word you said is device. I change my device every two years. The epic brief says a device can have several MAC addresses at the same time. When you're trying to link somebody based on a device, it's a guess. That's all it is. Our devices change very frequently. What Congress had in mind was things that identify a specific real-world person. The legislative history talks about identifying Judge Bork or Senator Leahy or Griffin Bell. It doesn't talk about identifying devices. Well, you don't need a name, you know, a specifically identifiable person. So it doesn't have to be a name. It doesn't have to be a name, but I still think it has to link to a person. Of course it could be that a DNA sample or a fingerprint or a retina scan might identify a person someday, but we're still thinking about things that have to identify people rather than devices. So Congress did not intend to protect my viewing habits when I download apps on my smartphone. Congress didn't intend to protect that. I don't think Congress intended to protect the casual consumption of content when you download apps on your smartphone to watch a video clip any more than it intended to protect when you go to a website and watch a video on a website casually driving by. I'll tell you a very quick story if I could. I was driving in last night. I had an 11-hour drive from D.C. because the weather was so bad I couldn't get in on a flight. And as we're driving through, the weather got really bad, and at one point there was a tornado warning, and I needed to see something to figure out if we were in tornado territory. The quickest way to do that was on my mobile app to download the local television station's app and watch for five minutes to see whether we were in tornado territory. I don't even know what the station was. They don't know who I am. I wasn't trying to create a relationship with them. I wanted a video clip of the weather to find out if I was driving into a tornado. That's the casual relationship that's not covered by the BPPA. All right. I think we have your argument, Mr. Slillinger. And, Mr. Lawson, you've reserved some time for rebuttal. Yes, thank you, Your Honors. A few points. First, what Bango is doing with the information is, of course, not in our complaint and not in the record. I would point out that even if the sole purpose of these disclosures is to count unique video views, the disclosure itself does disclose to Bango who is watching these videos, and that's still an actionable disclosure, right? So I think you can disregard that, but I don't really think it changes the game at all. Second, on the point about the Yershov case, we were right about the disclosures. The discovery showed that they were disclosing the information. The discovery had begun to show that the recipient had a wealth of information that it could correlate with these disclosures. We were wrong about the device the plaintiff had used to watch the videos, and that's what was missing there. He's a – Mr. Yershov is a computer programmer, very tech savvy, and had a lot of devices, and that's where that case stumbled. So I also don't think there are many lessons we can take from that experience either. Another point, my friend mentioned this is not about ads. In fact, this is about ads, right? 2710b2d talks about when disclosures are permissible for the purpose of advertising to the subject of the disclosure. So this is clearly something Congress was contemplating. If you look at paragraph 31 of our complaint, there's a quote from the Senate report discussing the ability of providers to target ads in a way that at least some members of Congress thought was troubling. So, in fact, we are talking about exactly what this statute is meant to get at. And one final point, my friend keeps talking about what did this statute mean in 1988. And we've talked – there's plenty of briefing on the subject of how do we interpret broad terms in statutes as time passes, right? We don't need to repeat all of that here, but I would also point out that Congress considered all of this in 2013, so I think 2013 is the more appropriate touchstone for looking at what this language might mean, whether it be subscription or personally identifiable information. Thank you. All right. Thank you. Court is in recess until 9 o'clock tomorrow morning.